UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

                                          Case No. 22-cr-146-pp

   v.

GLENN E. CONROY, JR.,

        Defendant.

---

**ORDER GRANTING IN PART DEFENDANT'S UNOPPOSED SECOND MOTION TO DISMISS: SPEEDY TRIAL (DKT. NO. 54) AND MAKING FINDINGS**

---

On July 19, 2022—almost two and a half years ago—a grand jury returned an indictment against the defendant, charging him with two counts of armed bank robbery, two counts of using and carrying a firearm during and in relation to crimes of violence (the bank robberies) and one count of being a prohibited person in possession of a firearm. Dkt. No. 1. At that time, the defendant was in custody in Racine County. Dkt. No. 2. At the August 3, 2022 initial appearance in federal court, before the magistrate judge had the opportunity to conduct the initial appearance, defense counsel advised the magistrate judge that he had concerns about the defendant's competence to assist in his defense and stated that he would be filing a motion asking the court to commit the defendant to the custody of the Attorney General for evaluation. Dkt. No. 4.

In the over two years since, there have been several delays, some excludable under the Speedy Trial Act, others not. On June 19, 2023, the

defense filed a motion to dismiss the case on Speedy Trial grounds. Dkt. No. 15. Magistrate Judge Nancy Joseph recommended that this court deny that motion, dkt. no. 22; the defendant objected, dkt. no. 26, and this court adopted that recommendation on December 29, 2024, dkt. no. 53. But the court observed that by that time, the defendant also had filed an "update" seeking dismissal based on events that had occurred since Judge Joseph had issued her recommendation; the court ordered the defendant to file a formal motion stating the grounds for, and arguments in favor of, that request. Id. The defendant filed that motion on December 13, 2024. Dkt. No. 54. On December 30, 2024, the government filed a response to the motion, conceding the Speedy Trial violation but asking the court to dismiss without prejudice and to make written findings considering the statutory factors. Dkt. No. 56. The defendant file his reply on January 10, 2025. Dkt. No. 57.

The court will grant the defendant's motion to dismiss, but will dismiss without prejudice, as the government requests.

## I. Procedural Background

At a hearing on December 9, 2024, the court gave the parties an oral ruling on the defendant's objections to Judge Joseph's recommendation that the court deny the defendant's first motion to dismiss. Dkt. No. 55. The court began by reciting the procedural history to that point:

> You know, of course, that Mr. Conroy was indicted on July 19th of 2022, five counts, two counts of bank robbery, same bank couple days apart. Each of those counts is accompanied by 924(c) charge and then there's finally a prohibited person in possession of a firearm charge.

2

But what is significant, of course, with regard to what we're here to talk about today is that Mr. Conroy had his initial appearance on August 3rd of 2022, and before even like the first opportunity for him to open his mouth at the arraignment, defense counsel advised the Court, Judge Joseph, I think, that the defense was going to be filing a motion for a competency evaluation.

And so the Court adjourned the initial appearance and—and didn't take a plea, didn't conduct the arraignment, just simply adjourned the whole kit and caboodle; and that same day, I think, August 3rd of 2022, the defense filed an unopposed motion for determination of competency. That's at docket number five.

And I should note that that motion went into some detail about Mr. Conroy's previous history up to that point with mental health issues in state court proceedings in which he had been determined to be incompetent.

So the—the point there is that this—this is a kind of a longish history that Mr. Conroy has with these sorts of issues. This is not something that came up as of the federal indictment.

So as a consequence of that motion, Judge Joseph ordered a psych examination and evaluation. That order is at docket number 22. And, of course, what we know under the statute what that means is that he has to be committed to the custody of the attorney general for that evaluation, and so he was.

During the time that he was in custody on August 5th of 2022, while in the custody of the B.O.P., in relation to the competency evaluation, he swallowed two items, Mr. Conroy did, a pencil and a spoon which rendered him ineligible for transport to the facility that had been designated to evaluate him.

He was en route, so to speak, although in—in the marshal's service terms en route often means stop, start, stop[,] start, but he was on his way to the facility designated for the evaluation when he swallowed the pencil and the spoon. It is at docket number 22 at pages one through two, and docket number 16-2 at pages one and three.

He didn't get cleared to travel again until September 23rd of '22, and then only on a special operation air program flight so that there could be personnel there to evaluate and in order to at least observe him to prevent him from any further self-harm. Again,

docket number 22 at page two, citing dockets number 16-4 at one and 16-7 at one.

On October 3rd of 2022, he was designated to a new facility that apparently would better be able to accommodate his particular medical needs, again, page two of docket number 22, citing docket number 16-7, and on October 13th of 2022, he was admitted to FCI Butner, which is where a number of these types of evaluations take place for male incarcerated persons.

Mr. Conroy was at Butner for examination from his admission on October 13th of 2022 until November 23rd of 2022 and then began the laborious process of getting him shipped back to Wisconsin. He didn't arrive back in Wisconsin until December 8th of 2022. Again, this is all [i]n Judge Joseph's R&R at docket number 22.

On December 13th the examiner at Butner, again 2022, December 13th, 2022, the examiner at Butner filed a report concluding to a reasonable degree of psychological certainty that Mr. Conroy was incompetent to proceed, but [opining] that he could regain his competency with further treatment.

And on December 20th of 2022, Judge Joseph held a hearing with the parties. Neither party, neither the Government nor the defense, contested the report's conclusion that Mr. Conroy was not competent, and so Judge Joseph determined at that time on December 20th of 2022 at the hearing that Mr. Conroy was suffering from a mental disease or defect that rendered him mentally incompetent to proceed, and she ordered him committed to the custody of the United States Attorney General for treatment for the requisite period under the statute.

Unfortunately, it appears that there was no—unbeknownst to the parties at that time in December 20th, 2022[—]there were staffing issues at various B.O.P. facilities, and a facility was not available to accept Mr. Conroy for treatment.

And so as a consequence, he waited in custody six months and 22 days, and he finally got admitted to the Federal Medical Center at Devens on July 13th of 2023. And, again, the parties didn't find that out right away, the fact that—that there was this staffing shortage and this facility delay. That was something that they discovered later and then reported to Judge Joseph.

4

So, again, he's—Mr. Conroy's admitted on July 13th of 2023 to Devens, and on June 19th of 2023, shortly before that, while Mr. Conroy was still sort of waiting to find out where he was going to go and when he was going to go there, the defendant filed the first of the two pending motions, and that is the motion at docket number 15, motion to dismiss the case on speedy trial grounds and restoration of competency.

Id. at 5, line 1 through 8, line 18.

Next, the court summarized Judge Joseph's November 1, 2023 report and recommendation:

Regarding the Speedy Trial Act argument, Judge Joseph determined that Mr. Conroy actually was not subject to the Speedy Trial Act for much of the time period covered because, quote, "the Speed[y] Trial Act's", quote, "language plainly ties applicability to the entering of a not guilty plea," close quote. And because Mr. Conroy had not entered a not guilty plea at the time that he had made his initial appearance and throughout much of the period that he was being transported back and forth, she found that 3161(c)(1) didn't apply to him.

She said if the B.O.P. was successful in restoring his competency, he then would have the option to either enter a guilty plea or not guilty plea and at that point in time the—the speedy trial clock would come into play.

She also in the alternative determined that even if the Speedy Trial Act had applied to Mr. Conroy at the time of his initial appearance, quote, "the speedy trial clock would've run August 15th through 24th, 2022, and September 23rd through October 12th, 2022, leaving him 40 days on his clock," close quote. That's at page 19 of docket number 20—22, and Judge Joseph put together a chart showing the periods of time that were excluded and the periods that were not excluded. That chart shows up on page 19 of docket number 22.

She then turned, Judge Joseph did, to the Fifth Amendment due process argument, and she said that she agreed that the amount of time that had been—the delay that had occurred in transporting Mr. Conroy back and forth was unreasonable, but she said that dismissal was not a remedy to address the six month and 22 days that he had been waiting, Mr. Conroy had, for admission to FMC Devens. This is at pages 20 through 21 of docket number 22.

5

She referred to several district court opinions, none of which are binding, and I think a few of which are unpublished, maybe all of them, which had concluded that systemic delays were not sufficient to warrant dismissal for Fifth Amendment reasons for due process reasons, and I'll go into those in a little bit more detail.

And then, finally, she turned to the Sixth Amendment challenge, citing a four-factor test and concluding that Mr. Conroy had failed to meet those factors. She concluded the first two factors weighed only slightly in his favor and the second two weighed squarely in the Government's favor. That's at page 24 of docket number 22.

Id. at 9, line 5 through 10, line 21.

The court explained that since November 1, 2024, when Judge Joseph had issued her recommendation, other events had occurred, and it recounted those events through the date of the December 9, 2024 hearing:

On December 13th of 2023, the Devens psychological report was filed, and that one concluded that Mr. Conroy was competent, and six days later the defendant filed an objection to the R&R. The day after that Judge Joseph, on December 20th of 2023, held, finally, the arraignment and plea because Devens had concluded that he was competent, but at that hearing the defense advised Judge Joseph that it was going to be contesting the finding from Devens that Mr. Conroy was fully competent.

So we've got these kind of two parallel things that are going on, the defendant is objecting to and the parties are briefing the objection on—on Judge Joseph's recommendation with regard to the speedy trial motion, and at the same time there's a psychiatric report that's been filed from the staff at Devens that the defendant has asserted that he's going to challenge and has said that he's going to need time to address in terms of pulling together his own resources to challenge that.

There were several status reports that took place after December 20th of 2023, mostly sort of logistically trying to work out how an evidentiary hearing might work for the defense to contest the competency determination. Meanwhile, on December 28th of 2023, the Government—the objection to Judge Joseph's R&R was fully briefed. So all of that was kind of going on at the same time, but

again, the—the objection to the ruling on docket number 15 was fully briefed on December 28th of 2023.

Fast forward to March of 2024, and on March 4th of 2024, Mr. Conroy filed a motion to dismiss count five, which is the prohibited person in possession of a firearm count. That motion was based on the Supreme Court's decision in Bruen, in the Bruen case, New York State Rifle & Pistol Association v. Bruen, 597 U.S. 1, 2022 decision, and it was a facially and as [] applied constitutional challenge on Second Amendment grounds to the 922(g)(1) charge.

On April 5th of 2024, the Government filed an objection, the objection was only five pages, and attached to that objection an almost 100-page brief that it had filed in the Court of Appeals on the same Second Amendment issue.

The defense then filed a reply on April 29th of 2024 saying we're not quite sure what to reply to given the fact that—that this is a brief in a different case and under different facts. So arguably that motion was fully briefed as of April 29th.

On July 30th of 2024, Judge Joseph issued an order sort of recounting the fact that the Government had filed a brief from another case, and—and an appellate brief at that, and—and sort of speculating that the Government had really only addressed the facial challenge to the statute and not the as applied challenge and asking the Government to supplement the briefing and the defense to supplement the briefing with regard to the specifics of Mr. Conroy's situation. The Government did file its supplemental response, but the defense elected not to file a sur-reply.

On August 16th of 2024, the defense filed a letter saying that it didn't have any further argument to make, it acknowledged that I was the district court judge assigned to this case, and that since the parties had briefed the motion to dismiss in Mr. Conroy's case, I had decided pretty much the same issue in—in two decisions, the Washington case and McCaa case; and therefore the defense acknowledged that it likely would not succeed on that motion in front of me, and so on August 22nd of 2024, Judge Joseph filed a report and recommendation recommending that I deny the motion to dismiss count five. And true to its indication, the defense has not filed an objection to that. That motion to dismiss on count five was at docket number 40.

So the two pending motions then are docket number 15, which is the speedy trial motion, and docket number 40, which

is the—the Second Amendment motion to dismiss count five.

Now, finally, from a procedural standpoint as I noted on December 3rd, [defense counsel] filed an update on the speedy trial motion. I suspect that that came out of the fact that about a month ago on November 6th I scheduled today's status conference, and so I think that this update was filed knowing that the status conference was coming up. In fact, [defense counsel] referred to it in—in his update, but the update in the main relates to events that had transpired since docket number 15 was filed, since the original speedy trial motion, and it recounts delays that the defendant argues are not excludable that have occurred since that time and that do not have to do with Mr. Conroy's transportation back and forth with regard to the competency evaluation.

So that's procedurally where we are.

Id. at 11, line 2 through 14, line 9.

The court will not reproduce its reasoning, but over the next twenty-eight pages of the transcript, the court explained in detail why it agreed with Judge Joseph's recommendation that it deny the defendant's motion to dismiss the case, both on Speedy Trial grounds and on constitutional grounds. Id. at 14, line 20 through 41, line 12. The court also denied the defendant's Second Amendment motion to dismiss Count Five. Id. at 41, line 13 through 43, line 17. It then turned to the "update" the defense had filed a few days before the December 9, 2024 hearing, observing that that "update" addressed "other delays that have occurred since these motions were filed and the impact that these delays have on the speedy trial clock." Id. at 43, lines 20-25. It explained that the government had not had the opportunity to respond to those arguments; it also offered the defense the opportunity to polish those

arguments in a formal, second motion to dismiss. Id. at 44, lines 2-10. The defense elected to file a formal motion. Id. at 44, line 25 through 45, line 7.

The defense filed that second motion—the one at issue here—on December 13, 2024. Dkt. No. 54. The defense explains that

> [m]uch has happened since [the defendant's] original motion and Judge Joseph's Recommendation. [The defendant] was not found competent until February 12, 2024. Therefore, the time from November 21, 2023, until [the defendant] was found competent on February 12, 2024, is excluded under § 3161(h)(4). However, the speedy trial clock continued to toll after that. On February 12, 2024, Judge Joseph made an ends-of-justice finding, and excluded all time from February 12, 2024, to March 4, 2024. That time is excluded under § 3161(h)(7)(A). On March 4, 2024, [the defendant] filed a motion to dismiss County Five of the indictment. Dkt. No. 40. That motion also triggered an exclusion of time. The issue here is how much time.

Id. at 2.

The defendant argues that whenever a defendant files a motion, two provisions of the Speedy Trial Act (18 U.S.C. §3161) are triggered. Id. He says that the first provision is §3161(h)(1)(D), which "automatically" excludes the time from the filing of the motion to either the conclusion of any hearing on that motion or the "prompt" disposition of the motion. Id. It argues that the second provision is §3161(h)(1)(H), which excludes up to thirty days of delay occurring while the court has the proceedings "under advisement." Id. Quoting United States v. Avila, 106 F.4th 684, 698 (7th Cir. 2024), the defense says that "[i]n practice, these two provisions automatically exclude from the speedy trial clock the time beginning with the filing of a pretrial motion until thirty days after the court receives the parties' post-motion-hearing briefs." Id.

The defendant explains that his first Speedy Trial motion was fully briefed as of April 29, 2024, when he filed his reply brief. Id. at 3 (citing Dkt. No. 43—the defendant's April 29, 2024 reply brief in support of the motion to dismiss). He calculates that the period from the filing of his motion (on June 19, 2023—Dkt. No. 15) through the filing of the reply brief (on April 29, 2023— Dkt. No. 43) was excluded (because the motion was pending), as was the thirty-day period after April 29, 2023 (under §3161(h)(1)(H)). Id. He asserts that the Speedy Trial clock resumed running on May 30, 2024. Id. He recounts that on July 30, 2024, however—sixty-two days later—Judge Joseph issued an order requesting supplemental briefing on the motion. Id. (presumably referencing Dkt. No. 47). He says that the government filed a supplemental brief on August 6, 2024 (presumably referring to Dkt. No. 48), and that ten days later, on August 16, 2024, the defense filed a notice advising the court that it would not be filing a sur-reply (presumably referring to Dkt. No. 49). Id. He says that six days later, on August 22, 2024, Judge Joseph issued her report and recommendation (citing Dkt. No. 50). The defendant recounts that neither party objected to that report and recommendation, and that this court adopted it on December 9, 2024 (110 days later). Id.

The defendant says it isn't clear what impact Judge Joseph's July 30, 2024 request for supplemental briefing had on the Speedy Trial calculation. Id. He speculates about several options. The first is that the request had no impact, because Judge Joseph did not exclude any time in relation to that order, so the clock continued to run until December 9, 2024, when this court

issued its order adopting Judge Joseph's recommendation. Id. He calculates that under that scenario, "194 days passed unexcluded." Id. The second speculation is that the motion to dismiss wasn't fully briefed until the deadline for objecting to Judge Joseph's recommendation had expired (September 5, 2024) and the thirty-day "under advisement" period had expired (October 5, 2024). Id. at 3-4. He calculates that under that scenario, the sixty-four days between October 5, 2024 and this court's decision on December 9, 2024 would be unexcluded. Id. at 4. Third, he speculates that the Speedy Trial clock may have restarted on May 30, 2024, but stopped on July 30, 2024, when Judge Joseph requested supplemental briefing. Id. In that case, he says, it would have started again on October 6, 2024, thirty days after objections to Judge Joseph's report and recommendation were due. Id. That calculation would result in 124 days between May 30, 2024 and December 9, 2024 not being excluded. Id. The fourth option, the defendant says, is that the Speedy Trial clock ran from May 30, 2024 to July 30, 2024 (the day Judge Joseph asked for supplemental briefing), stopped until August 22, 2024 (when the defense reported that it would not be filing any supplemental materials), then ran from August 23, 2024 through December 9, 2024 (resulting in 169 days between May 30, 2024 and December 9, 2024 not being excluded). Id.

The defendant argues that under any of these scenarios, if one adds in the thirty days of unexcluded time that passed before he was transported to the Bureau of Prisons for his first competency evaluation (which both Judge Joseph and this court concluded had not been excluded), more than seventy

11

unexcluded days had expired, warranting dismissal on Speedy Trial grounds. Id.

The defendant next argues that the court should dismiss the indictment with prejudice. Id. He refers the court to 18 U.S.C. §3162(a)(2), which lists three factors for the court to consider in deciding whether to dismiss with or without prejudice: the seriousness of the offense, the facts and circumstances leading to dismissal and the impact of re-prosecution on the administration of the Speedy Trial Act and the administration of justice. Id. at 4-5 (citing United States v. Taylor, 487 U.S. 326 (1988); United States v. Lloyd, 50 F.4th 648 (7th Cir. 2022); United States v. Killingsworth, 507 F.3d 1087 (7th Cir. 2007)).

The defendant does not disagree that he is accused of having committed serious offenses. Id. at 5. But he implies that the seriousness of the alleged offenses is "undercut" by his "longstanding and severe mental illness." Id. He argues that the second factor—the facts and circumstances leading to dismissal—"weighs heavily" in favor of dismissing with prejudice. Id. While admitting that there is no "bright-line rule" about what circumstances warrant dismissal with prejudice, he says that the court should take into account not only any delay since May 30, 2024, but the "other delays in this case." Id. at 5-6. He reminds the court that he sat in custody for almost six and a half months, waiting to be transported to the custody of the Bureau of Prisons for competency restoration, and that Judge Joseph and this court agreed that that delay was unreasonable. Id. at 6. He maintains that he didn't just sit passively during that time—he filed his first Speedy Trial motion "18 months ago." Id. at

6. He recounts that over a year later, he filed a *pro se* letter complaining that his lawyer had not filed a new Speedy Trial motion, asking why the case had not moved and asserting that his rights were being violated. Id. (citing Dkt. No. 45). He argues that it was not any inappropriate conduct on his part that caused the delays. Id. And he contends that the responsibility for the delay falls on the government, for failing to ask for a trial date or to exclude time. Id. at 6-7.

The defendant also argues that the excluded delays are the government's responsibility, asserting that "for decades now" the government has been subjecting defendants to lengthy post-incompetency delays and forcing them to sit in jail indefinitely." Id. at 7. (He explains in a footnote that by "the government," he's not referring to the U.S. Attorney's Office—he's referring to the Bureau of Prisons, an arm of the Department of Justice. Id. at 7 n.1.)

As for the impact of reprosecution, the defendant says that the court must consider prejudice to him and whether dismissal with prejudice is necessary to discourage repeated violations of the Speedy Trial Act. Id. at 7-8. He argues that in considering the prejudice to him, the court should consider not only prejudice to his ability to prepare for trial but prejudice resulting from the restrictions on his liberty. Id. at 8. He urges the court to consider the six and a half months he waited to be transported for competency restoration. Id. And he urges the court to consider whether the circumstances here are likely to re-occur. Id. In that regard, he says that "the unreasonable pre-commitment delays are systemic in the BOP, have been for some time, and are continuing

today," citing multiple cases from other districts. Id. at 9. The defendant argues that "[d]ismissing with prejudice sends the appropriate message to the BOP that its failure to remedy this longstanding problem has consequences." Id.

The government concedes that even with the legitimately excluded time, "there has been a violation of the Act's 70-day indictment-to-trial rule." Dkt. No. 56 at 3. But it argues that the court should dismiss the case without prejudice. Starting with the seriousness of the offenses, the government explains:

> The defendant is charged with two bank robberies two days apart, two counts of brandishing a firearm in relation to a crime of violence and felon in possession of a firearm. The facts underlying the charges are straightforward. On May 2, 2022, a male subject, later identified as [the defendant], entered the federally insured Guardian Credit Union located at 7501 West Greenfield Avenue, in West Milwaukee, Wisconsin. [The defendant] approached a teller (C.M.), produced a black semi-automatic handgun, and twice stated something to the effect of "Give me the money." C.M. responded by giving [the defendant] approximately $3,380.00 in U.S. currency. He then fled the credit union on foot.

> Two days after the initial robbery, on May 4, 2022, at approximately 1:20 p.m., [the defendant] entered the same Guardian Credit Union located at 7501 West Greenfield Avenue, West Milwaukee, Wisconsin. Three tellers, J.L., E.M. and C.M. (who was robbed on May 2, 2022) were working at their stations when he entered. [the defendant] approached J.L., produced a black semi-automatic handgun, and twice stated "Give me the money." J.L. then gave him approximately $1,980.00 in U.S. currency, which were all in $20.00 bills. J.L., C.M. and E.M. all recognized the robber as the same subject who robbed the credit union two days prior. After the robbery, [the defendamnt] traveled on foot to a neighboring parking lot where he was taken into custody by responding officers from the West Milwaukee Police Department.

> A search of [the defendant] after his arrest revealed a loaded Glock 9mm semi-automatic handgun with serial number BSMZ336 and $1,980.00 in[] his pants pockets. {the defendant] is a felon and prohibited from possessing any firearm after serving nearly four

14

years in prison on a prior felony conviction. [The defendant] was also on supervision with the state when he committed these offenses and revocation proceedings are currently pending.

Id. at 5-6. The government recounts that the mandatory minimum penalty for the offense of brandishing a firearm during and in relation to a crime of violence is seven years consecutive to any other sentence, and argues that dismissal of such serious offenses would result in a miscarriage of justice. Id. at 6.[1]

As for the facts and circumstances leading to dismissal, the government reminds the court that it already has rejected the defendant's request to punish the prosecution for the unreasonable delays in transporting the defendant for competency restoration. Id. at 7. It asserts that there has been no bad faith on the prosecution's part (and reminds the court that at one point, it requested a status conference to try to move the case forward). Id. at 7-8. It notes that the defense filed "numerous" motions to continue, including motions to adjourn the trial—motions that the prosecution did not oppose. Id. at 8. And

---

[1] The government argues that the second brandishing charge increases the mandatory minimum penalty from seven years to twenty-five years, to be served consecutively to any other sentence. Dkt. No. 56 at 6. This was correct prior to Congress's passage of the First Step Act of 2018, but the First Step Act modified 18 U.S.C. §924(c), inserting the words "after prior conviction under this subsection has become final" in place of the words "second or subsequent conviction." Since the passage of the First Step Act, a defendant faces a seven-year mandatory minimum for brandishing a firearm during and in relation to a crime of violence whether he faces one or five §924(c) counts in a single case. He faces the twenty-five-year enhanced mandatory minimum only if he has a prior, final conviction for violating §924(c) at the time he commits the instance offense. See 18 U.S.C. §924(c)(1)(C)(i).

it observes that the defense did not request prompt resolution until after the Speedy Trial clock had run. Id.

Finally, the government argues that the defense has not argued that the delay has prejudiced the defendant's ability to prepare for trial. Id. It urges the court to reject a blanket rule dismissing a case solely because the defendant has been in custody during delays. Id. at 9. And it points to cases in which the Seventh Circuit has approved dismissal without prejudice where the delay was unintentional and the defendant did not suffer prejudice. Id.

In reply, the defendant says that the government did not address his argument that his mental illness undermined or mitigated the seriousness of his offenses. Dkt. No. 57 at 2. He maintains that although his mental illness does not warrant weighing the first factor in favor of dismissal with prejudice, the mental illness "minimize[s] the extent to which [the seriousness of the offense] weighs in favor of dismissal with prejudice." Id.

As to the second factor, the defendant argues that this was "not a minimum violation" of the Speedy Trial Act. Id. He says that the alleged 224 days of unexcluded time "triples the statute's 70-day threshold." Id. And he argues that he did not simply sit and wait for the seventy-day clock to run; the defendant argues that after only thirty days of unexcluded time had passed, he filed his first motion to dismiss. Id. (citing Dkt. No. 15). He points out that while that motion was pending, he filed a *pro se* letter complaining that his Speedy Trial rights were being violated. Id. (citing Dkt. No. 45). He says no one can argue that he needed to do more to move the case along, and while he isn't

arguing that the government acted in bad faith, he says it's the government's burden to prosecute. Id. at 2-3. The defendant also reiterates that the court should consider the time he sat waiting for transport to Devens—a delay he says *is* attributable to the government (albeit the BOP). Id. at 3.

Finally, the defendant reiterates that he's been prejudiced "by the extended pretrial restrictions on his liberty" and he says that the delays in transporting him—a person who was mentally incompetent—for restoration require dismissal "to yield a remedial effect." Id. at 3-4. The defendant says that, contrary to the government's arguments, he's not proposed a blanket with-prejudice dismissal rule any time a defendant is in pretrial detention and there has been a violation. Id. at 4. He says he's focusing on the specific facts of his individual case, and he asserts that the government is proposing a blanket rule precluding dismissal based on detention. Id. And he says that the government ignores the remedial impact dismissal with prejudice would have on the "longstanding systemic transportation delays." Id. Finally, the defendant disagrees with the government's assertion that dismissal without prejudice isn't a "toothless" sanction. Id. He asserts that this is not a case where dismissal without prejudice could raise statute-of-limitation issues. Id. He predicts that the government simply will return to the grand jury and re-indict him, and he says the government hasn't explained how that is a sufficient sanction. Id. at 5. In fact, he argues, dismissal without prejudice will further delay prosecution and extend his pretrial detention. Id.

Section 3162(a)(2) of the Speedy Trial Act requires that if a defendant is not brought to trial within the time limit specified by §3161 (seventy days, minus any time excludable under §3161(h)), the indictment "shall be dismissed on the motion of the defendant." The section states that

> [i]n determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice.

Regarding the seriousness of the offense, the Seventh Circuit has explained that this factor requires the court to rely on its own experience to determine "whether the offense is serious compared to other federal crimes." United States v. Lloyd, 50 F.4th 648, 655 (7th Cir. 2022). The appellate court has emphasized that "the mere fact that no one was injured during the commission of the crime is insufficient to support a finding that an otherwise grave offense (such as possession of a firearm in furtherance of a drug-trafficking crime) weighs in favor of dismissal with prejudice." Id. (citing United States v. Killingsworth, 507 F.3d 1087, 1090 (7th Cir. 2007)). When the crime is a serious one, "the sanction of dismissal with prejudice should . . . be imposed only for a correspondingly serious delay." Id. (quoting United States v. Carreon, 626 F.2d 528, 533 (7th Cir. 1980)).

The Seventh Circuit has held that a district court judge's characterization of bank robbery as "quite serious" was accurate. See United States v. Sykes, 614 F.3d 303, 310 (7th Cir. 2010) (citing United States v. Jones, 213 F.3d 1253, 1257 (10th Cir. 2000)). Federal court case loads can be

18

heavy with drug offenses, gun possession offenses and white-collar offenses; bank robberies, and particularly armed bank robberies, are some of the more violent and terrifying crimes prosecuted in federal court. In this case, the defendant allegedly robbed the same bank twice within a two-day period and victimized the same employee both times (along with two other employees on the second occasion). He was armed on both occasions, even though he is a prohibited person. There is no question that the alleged offenses are very serious.

The defendant says that his severe mental illness minimizes the serious nature of these offenses, or at least minimizes the weight the court should place on the first factor. In support of this argument, he cites a 2005 sentencing decision from another judge on this court, in which the judge decided to impose a lower sentence on a defendant who had committed six bank robberies because he found that the defendant's mental illness "played a major role in the offenses and that his success in treatment made him less likely to re-offend." United States v. Pallowick, 364 F. Supp. 2d 923, 927 (E.D. Wis. 2005). But a court's analysis of the seriousness of an offense for purposes of deciding on an appropriate punishment is different from a court's analysis of the seriousness of the offense for purposes of deciding whether to dismiss an indictment with prejudice. The former requires the court to balance numerous factors in arriving at a sentence that addresses all the 18 U.S.C. §3553(a) factors. The second requires the court to consider whether the Speedy Trial violation warrants allowing someone charged with serious offenses that

19

impacted innocent victims to escape prosecution. If the defendant committed these offenses, it may be that his mental illness had something to do with his reasons for committing them and the way he committed them. But the question the court must answer is whether these bank robberies are the sorts of serious offenses that the Seventh Circuit has said warrant dismissal with prejudice only for a correspondingly serious delay. The court concludes that they are.

The second factor the court must consider is the facts and circumstances of the case that led to the dismissal. The Seventh Circuit, citing the Supreme Court's decision in United States v. Taylor, 487 U.S. 326, 340 (1988), has explained that the length of the delay "is 'a measure of the seriousness of the speedy trial violation . . . .'" Lloyd, 50 F.4th at 656. That said, the court also has advised that "even a lengthy delay 'does not by itself require dismissal with prejudice.'" Id. (quoting Sykes, 614 F.3d at 310) (in which the court affirmed dismissal without prejudice despite a delay of 224 non-excludable days)). In considering a defendant's motion to dismiss a case for violation of the Speedy Trial Act (as opposed to the Sixth Amendment), "actions by both parties—the defense and the prosecution—are relevant[;]" the court considers not only whether the government acted in bad faith but whether a defendant waited passively while the Speedy Trial clock runs out. Id. (citing Taylor, 487 U.S. at 339; United States v. Fountain, 840 F.2d 509, 513 (7th Cir. 1988)).

The defendant is correct that Judge Joseph and this court concluded that thirty days of the time the defendant waited to be transported to the BOP

for evaluation was not excluded. The defendant calculates that, depending on how Judge Joseph's request for additional briefing and the supplemental briefing itself impacts the calculation, another sixty-four to 194 additional days were not excluded, resulting in twenty-four to 154 days of unexcluded time beyond the seventy-day Speedy Trial period. Any way one calculates it, this is less time that the amount of unexcluded time in <u>Sykes</u>, in which the Seventh Circuit affirmed the trial court's dismissal without prejudice. And the defense in this case has not alleged that the unexcluded time was the result of misconduct or negligence by the prosecution.

Instead, the defendant argues that the court should consider not only the twenty-four to 154 days of unexcluded time that led to the dismissal of the indictment, but the months the defendant sat waiting to be transported to the BOP for competency restoration. He argues that the court needs to send a message to the Bureau of Prisons that courts do not countenance such delays. He maintains that dismissal with prejudice will send such a message.

The court discussed this argument at the December 9, 2024 hearing. Six-and-a-half months elapsed between December 20, 2022—the day Judge Joseph determined that the defendant was not competent to assist in his own defense—and July 13, 2023, when the defendant was admitted to FMC Devens for competency restoration. Dkt. No. 55 at 25, lines 11-15. The defendant argued that that delay resulted from the BOP's "negligence." <u>Id.</u> at lines 17-19. At the December 9, 2024 hearing, the court said:

> But there are several problems with this argument: The first
> one is that the defendant puts in his brief a Speedy Trial Act clock

21

calculation table, and as best I can tell, he comes up with that 203-day date because he seems to think he wasn't deemed incompetent until the day he arrived at FMC Devens on July 13th of 2023. That's at page six of docket number 26.

If that—If I'm right about that assumption or that impression, that's just flat out incorrect. The docket shows that Judge Joseph deemed Mr. Conroy incompetent at the hearing on December 20th, 2022. So as of December 20th of 2022, there was a court order deeming him to be incompetent. Section 3161(h)(4), quote, "unambiguously requires the exclusion of all time during which a defendant is incompetent to stand trial," close quote. That's <u>United States v. Romero</u>, 833 F.3d 1151 at 1155, a Ninth Circuit decision from 2016. The—The emphasis added is mine.

Also <u>United States v. Patterson</u> from our circuit, 872 F.3d 426 at 433, 2017 case from the Seventh Circuit. Quote, "Defendant's argument, however, overlooks 18 U.S.C. 3161(h)(4) which excludes any period of delay resulting from the fact that the defendant is mentally incompetent or physically unable to stand trial," close quote.

And, finally, at an Eleventh Circuit decision, <u>United States v. Pendleton</u>, 665 Federal Appendix 836 at 839, Eleventh Circuit decision from 2016, quote, "A plain reading of the statute does not necessitate the conclusion that only one of the exclusions under 3161(h) can apply at a time," close quote.

So whether or not, and we can certainly argue about whether or not the amount of time that it took to get Mr. Conroy to Devens was negligent or if that's the way you want to characterize the fact that apparently there were staffing shortages and facility shortages that prevented there being a place for him to be evaluated for that length of time, but that fact has nothing to do with whether or not he had been during that period of time deemed incompetent. He had, and that didn't change throughout that entire period.

<u>Id.</u> at 25, line 20 through 27, line 7.

The court understands that the defendant is not arguing—at this point, anyway—that the court erred in concluding that the six-and-a-half-month wait for transportation to FMC Devens was excludable. He is arguing that in considering the facts and circumstances of the case that led to dismissal, the

22

court should consider the fact that he was forced to wait, in custody and after having been deemed incompetent, for six-and-a-half months before he could begin restoration treatment. And he asserts that that delay was unreasonable.

No defendant should have to wait over half a year to be transported to a BOP facility for competency restoration. Congress has delegated to the Attorney General (and, through that official, to the Bureau of Prisons) the responsibility for evaluating competency and for attempting to restore competency. The Bureau of Prisons should be fully funded and sufficiently staffed to shoulder these responsibilities. There likely are many reasons why it is not, including loss of staff during the pandemic. But this court's dismissal of serious charges against the defendant will not address funding or staffing shortages at the Bureau of Prisons. As the Supreme Court has said, "If the greater deterrent effect of barring reprosecution could alone support a decision to dismiss with prejudice, the consideration of the other factors identified in § 3162(a)(2) would be superfluous, and all violations would warrant barring reprosecution." Taylor, 487 U.S. at 342. The delay was not caused by negligence on the part of the prosecution. It was caused by factors that, while in desperate need of addressing, were outside of the parties' control. It is not a basis for dismissing the indictment with prejudice. The remaining delay, while unexcluded, is not severe enough to warrant dismissal with prejudice of charges as serious as those pending against the defendant. And arguably, dismissal *without* prejudice still can send a message to the Bureau of Prisons that its understaffing and underfunding is having real ramifications on the

23

government's ability to prosecute people accused of crimes and on defendants suffering from mental illness.

Finally, the court must consider the impact of a reprosecution on the administration of the Speedy Trial Act and the justice system. Dismissal without prejudice will not negatively impact the administration of the Speedy Trial Act. The Supreme Court has held that dismissal without prejudice "is not a toothless sanction: it forces the Government to obtain a new indictment if it decides to reprosecute, and it exposes the prosecution to dismissal on statute of limitations grounds." Id. Perhaps, as the defendant argues, the limitation issue is not in play here. But the government still must go back to the grand jury to seek an indictment. And while there have been unexcludable delays in the months since Judge Joseph found the defendant competent, the defendant has not made the case that those delays prejudiced his ability to prepare for trial. As the court has said, the defendant should not have had to wait over six months to be transported to a facility for restoration while suffering the symptoms of mental illness. But he was transported (eventually) and his competency restored. To the extent that any human being is prejudiced by being held in custody—and unquestionably any human being is prejudiced by being held in custody—the defendant has not demonstrated that he has been rendered unable to prepare for trial or litigate his case.

The court agrees that it must dismiss the indictment but will do so without prejudice. The §3162(a) factors do not warrant dismissal with prejudice.

The court **GRANTS IN PART** the defendant's motion to dismiss on Speedy Trial grounds. Dkt. No. 54.

The court **ORDERS** that the indictment, and this case, are **DISMISSED WITHOUT PREJUDICE**.

Dated in Milwaukee, Wisconsin this 13th day of January, 2025.

**BY THE COURT:**

_____

**HON. PAMELA PEPPER**
**Chief United States District Judge**